**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

|  |  |  |
|---|---|---|
| CHRISTY DORR, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:15-cv-00092-GZS |
| WOODLANDS SENIOR LIVING OF BREWER, LLC, | ) ) ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S *DAUBERT* MOTION *IN LIMINE* TO EXCLUDE**
**EXPERT TESTIMONY OF DR. SCOTT SCHIFF-SLATER WITH**
**INCORPORATED MEMORANDUM OF LAW**

Defendant Woodlands Senior Living of Brewer, LLC ("Woodlands"), hereby moves to

exclude certain testimony of Plaintiff's expert pursuant to F.R.Evid. 702 on the grounds that the

testimony: (1) lacks sufficient reliability to be admissible; and (2) reaches conclusions that are

beyond his expertise.  In support of this Motion, Woodlands states as follows:

**I.      BACKGROUND**

This lawsuit involves claims that Woodlands violated myriad employment laws when it

terminated Plaintiff for job abandonment after she left work without authorization on the

morning of June 26, 2014.  On that morning, Plaintiff learned from a co-worker that her

boyfriend, who was also a Woodlands employee, was cheating on her.  Plaintiff left immediately

upon hearing this news and did not contact a supervisor before leaving.  Although Plaintiff called

Woodlands a few hours later, she did not speak with a supervisor or explain the reasons for her

sudden departure, nor was Woodlands successful in its efforts to contact Plaintiff throughout the

day.  As a result, having heard nothing from Plaintiff during the course of the day, Woodlands'

Executive Director, Benjamin Smith, decided to terminate Plaintiff's employment for job abandonment.  Later in the afternoon of June 26, 2014, and after Mr. Smith had reached his decision regarding Plaintiff's termination, Plaintiff appeared at Woodlands unannounced and spoke with Mr. Smith.  Mr. Smith determined that nothing in his meeting with Plaintiff warranted a change to the termination decision he had reached earlier in the day.

Plaintiff now claims that Woodlands' decision to terminate her employment, rather than provide her with emergency leave, constituted discrimination, retaliation, and failure to accommodate her pregnancy and other alleged disabilities, including asthma and anxiety/depression.  In support of her claims, Plaintiff has designated Dr. Scott Schiff-Slater as an expert who would testify regarding Plaintiff's medical conditions "and how they may have related to her leaving work suddenly on 6/26/2014."  *See* **Exhibit A,** Plaintiff's Designation of Expert Testimony and Report of Dr. Schiff-Slater attached as Exhibit 1 thereto (hereinafter "*Schiff-Slater Report*") at p. 1.

Dr. Schiff-Slater states that he reviewed Plaintiff's medical records, her Complaint, and correspondence from Plaintiff's counsel.  *Schiff-Slater Report* at p. 1; *see also* **Exhibit B** Deposition of Dr. Schiff-Slater (hereinafter "*Schiff-Slater Depo.*") at 12:6-16.  Based on these materials, Dr. Schiff-Slater concludes that, prior to June 2014, Plaintiff carried diagnoses of anxiety, PTSD, ADHD, obsessive compulsive disorder, depression, panic disorder, possible bipolar disorder, and a history of abuse.  *Schiff-Slater Report* at p. 1.  He also concludes that the number of appointments for which Plaintiff saw providers not only indicates the severity of her symptoms, but demonstrates "her efforts to understand and take care of herself," her knowledge as to "when to seek help with these symptoms," and "good judgment on her part."  *Id.* at p. 1-2.

10075557.1

Dr. Schiff-Slater then goes on to state that he believes Plaintiff suffered "an anxiety attack, a panic attack" on June 26, 2014. *Id.* at p. 2. His basis for this conclusion rests on "certain issues that can't be disputed given the information" reviewed by him. *Id.* One of these "undisputed" issues is his conclusion that Plaintiff "was off her [psychiatric] medications on 6/26/14." *Id.* However, Dr. Schiff-Slater concedes in his own report that whether Plaintiff was on or off such medications on June 26 is a matter of speculation, as he states: "I suspect she stopped [the psychiatric medications] before 6/26/14 because (I did not see this specifically documented) she was trying to get pregnant." *Id.* Although Dr. Schiff-Slater states that avoiding psychiatric medications to achieve pregnancy is "commonly done by patients," *id.*, nowhere in his report is there a finding that Plaintiff was, in fact, off any medications on June 26, 2014.

Dr. Schiff-Slater also states in his report that Plaintiff "may have suffered an asthma attack" on June 26, 2014. *Id.* at 3. He then concludes that Ms. Dorr would have feared for her pregnancy on June 26, 2014, because it "is normal and expected for a pregnant women [sic] who is short of breath, and anxious and very uncomfortable, to be appropriately concerned about the safety of her fetus." *Id.* Again, however, whether or not Ms. Dorr was actually "short of breath" (or, for that matter, anxious and very uncomfortable) so as to cause fear for her pregnancy is a matter of speculation, given Dr. Schiff-Slater's explanation in his report that it can be "decided[d] in retrospect that it was more likely that she had a panic attack [as opposed to an asthma attack]." *Id.*; *see also Schiff-Slater Depo.* at 50:9-21.

Dr. Schiff-Slater concludes in his report that "we can say without question that her symptoms were very real, and would have precluded her ability to work, both for her own health self and for the safety of the patients she cared for." *Id.* Beyond that, he also concludes that he has "no question that her leaving work on June 26, 2014, was justified" and that "it showed good

10075557.1

judgement [sic], and it was the safe and appropriate action for her to take." *Id.* at 4.  Dr. Schiff-Slater states that it would not be expected for "someone in the midst of symptoms of shortness of breath and panic to pause to make extra phone calls [to a supervisor]." *Id.* at 3.  He bolsters this conclusion with his own opinion, "as a business owner," that "if one of my staff had this type of incident, I would not expect them to make the phone calls at that moment in time." *Id.*

Notably, Dr. Schiff-Slater did not have any direct communications with Plaintiff or rely on any information obtained directly from her in preparing his report.  *Schiff-Slater Depo.* at 11:25 – 12:16.  Nor did he review or identify any medical records for Plaintiff coinciding with June 26, 2014, or the day after.  *Id.* at 19:6-25.  Rather, the factual basis for Dr. Schiff-Slater's opinion as to what Plaintiff was experiencing on June 26, 2014, derives from the allegations in Plaintiff's Complaint, which Dr. Schiff-Slater simply assumed to be true, coupled with a review of Plaintiff's medical records, none of which coincided or referenced the events that occurred on June 26, 2014.  *Id.* 13:1-23, 19:6-25.

## II.    LEGAL STANDARD

Expert testimony may be admissible under F.R.Evid. 702 as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
   a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
   b) the testimony is based on sufficient facts or data;
   c) the testimony is the product of reliable principles and methods; and
   d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis." *Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25 (1st Cir. 2006) (citing *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).

-4-

10075557.1

When expert testimony is challenged, the Court's "gatekeeping responsibility" requires it to ensure that the testimony has a "reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1997). "[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 55 U.S. 136, 146 (1997). "It is the proponent of the challenged evidence who carries the burden of proof. That burden is not to prove that his or her expert's opinion or conclusion is correct, but that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Thorndike v. Daimler-Chrysler Corp.*, 266 F. Supp. 2d 172, 175 (D. Me. 2003).

III.    **ARGUMENT**

A.      **Dr. Schiff-Slater's opinions regarding Plaintiff's alleged medical condition on June 26, 2014, and how it may have related to her unauthorized departure from work, are unreliable and should be excluded**

In examining whether to admit an expert's testimony, the Court may consider a variety of factors, including "the verifiability of the expert's theory or technique, the error rate inherent therein, whether the theory or technique has been published and/or subjected to peer review, and its level of acceptance within the scientific community." *Ruiz-Troche*, 161 F.3d at 81 (citing *Daubert*, 509 U.S. at 593-95). However, these factors are not exhaustive, *see United States v. Mooney*, 315 F3d 54, 61 (1st Cir. 2002) (citing *Kumho*, 526 U.S. at 153), and determinations of reliability must ultimately be flexible and case-specific. *See Daubert*, 509 U.S. at 594.

Here, Plaintiff intends to offer Dr. Schiff-Slater to opine not only on Plaintiff's medical diagnoses on and prior to June 26, 2014, but also on how those medical conditions "may have related to her leaving work suddenly on 6/26/14," including her ability to continue working or to contact a supervisor prior to leaving work. Even if Dr. Schiff-Slater has a reliable basis for testifying as to Plaintiff's medical diagnoses leading up to June 26, 2014—an assumption that Woodlands does not concede—there is insufficient basis for Dr. Schiff-Slater to render an opinion as to whether one of those particular diagnoses (panic disorder) was exacerbated on that day, or whether that exacerbated condition justified a certain course of action with respect to Plaintiff's departing work and communicating with her employer..

For example, in *Donelson v. Providence Health & Servs.*, 823 F. Supp. 2d 1179 (E.D. Wa. 2011), the court excluded an expert's testimony that an extension of an employee's medical leave would have been a "reasonable accommodation" for the employer to make. *Id.* at 1192-94. Among other things, the court found that the expert's testimony did not have the requisite indicia of reliability where the expert failed to undertake a "sufficient independent investigation" of the employee's injury. *Id.* at 1193-94. Because the method through which the expert formed his opinion was limited to a review of documents, none of which dealt with the employee's particular injury or her job description, the court concluded the expert's testimony lacked sufficient reliability to be admissible under Rule 702. *Id.*

Just as the expert in *Donelson* lacked a reliable basis for opining on whether a particular accommodation was reasonable, Plaintiff's expert in this case lacks a reliable basis for opining on Plaintiff's particular medical condition on June 26, 2014, and how that condition may have affected her actions at work. As an initial matter, Dr. Schiff-Slater has not previously testified as an expert on the issue of an individual's ability to work on a given day. *Schiff-Slater Depo.* at

-6-

7:8-11.  Further, Dr. Schiff-Slater admits, for example, that he did not speak with or have any direct communications with Plaintiff.  Consequently, he does not know how she felt after leaving work or even how long it took for her to feel better.  *Id.* at 39:22 – 43:12, 48:2-7.  He also admits that he did not see or review any medical records pertaining to June 26, 2014, or the day after.  The sole evidence he relied on regarding what Plaintiff was feeling and experiencing on the morning of June 26, 2014, came from the sparse allegations in Plaintiff's Complaint and her medical records generally.  Although these documents may provide a reliable basis for Dr. Schiff-Slater to opine about Plaintiff's medical diagnoses *generally*, his exclusive reliance on these documents does not illustrate a "sufficient independent investigation" that would allow him to testify reliably as to the *specific* medical conditions that Plaintiff was allegedly experiencing on June 26, 2014.

The reliability of Dr. Schiff-Slater's opinion regarding Plaintiff's alleged medical condition on June 26, 2014, and how it may have related to her departure from work, is further undermined by the medical records on which he relied.  Dr. Schiff-Slater observes, for example, that Plaintiff visited providers in the past on many occasions, which demonstrated to him not only the severity of her conditions but her "good judgment" as to "when to seek help with these symptoms."  However, he concedes that there are <u>no</u> medical records demonstrating that Plaintiff saw a provider on June 26 or June 27, 2014.  He also states that, although he cannot agree with Plaintiff's judgment not to go to the emergency room on June 26, 2014, he would have recommended that she do so.  *Id.* at 51:17 – 52:5.  Yet, when Plaintiff next saw a medical provider on July 3, 2014, she made absolutely no mention of the events of the previous week.  *Id.* at 30:3 – 32:23.  Given that Dr. Schiff-Slater's methodology involved giving greater weight to medical records that were chronologically closer to June 26, 2014, *see id.* at 19:21-25, the

10075557.1

noticeable absence of any records that correspond to June 26, 2014, or that corroborate the events that day, undermines the reliability of his opinion regarding Plaintiff's *specific* medical condition on June 26 and how that condition may have related to her decision to leave work.

The inconsistent statements in Dr. Schiff-Slater's report also cut against the reliability of his methodology. For example, in concluding that Plaintiff had a panic attack on June 26, 2014, Dr. Schiff-Slater relied on certain "undisputed" issues, including his observation that Plaintiff was "off her [psychiatric] medications" on that day. However, earlier in his report, Dr. Schiff-Slater clearly states that he merely "suspect[s]" that Plaintiff was off her medications and that there is no specific documentation to support that assumption. Similarly, Dr. Schiff-Slater concludes that Plaintiff was "short of breath" and that her "symptoms were very real," despite his conclusion that it is more likely that Plaintiff experienced a panic attack rather than an asthma attack. Indeed, in his deposition, Dr. Schiff-Slater conceded the extent to which his conclusions are based on assumptions that may not, in fact, be true. *See Schiff-Slater Depo.* at 49:8 – 50:8 ("Can I say without question that everything I've read is accurate? No, I can only say that from my estimation she had a panic attack.").

Finally, even if Dr. Schiff-Slater had a reliable basis for opining about Plaintiff's medical diagnoses *generally*, that would not provide a reliable basis to extrapolate and form an opinion as to how such diagnoses may have affected Plaintiff's decision to leave work and fail to notify a supervisor on June 26, 2014. As Dr. Schiff-Slater admitted during his deposition, a person with Plaintiff's medical diagnoses might well be able to work after receiving the news that Plaintiff received the morning of June 26, 2014, and that, in general, "each person's ability to cope with bad news is different." *Schiff-Slater Depo.* at 32:24 – 36:7. Indeed, Dr. Schiff-Slater conceded that he could not testify to a reasonable medical certainty that Plaintiff was medically incapable

10075557.1

of giving notice of her perceived need to leave work on June 26, 2014. *Id.* at 35:16 – 36:21. In the absence of a "sufficient independent investigation" into Plaintiff's *specific* medical condition and experience on June 26, 2014, Dr. Schiff-Slater does not have a reliable basis for offering an opinion as to her ability to cope with the news she received that day, including her ability to continue working or contact a supervisor prior to leaving work.

The Court should therefore exclude Dr. Schiff-Slater from offering any opinion as to Plaintiff's specific medical condition on June 26, 2014, including his opinion that she suffered a panic attack, and should further exclude any opinion as to how that condition may have related to her decision to leave work.

> **B.      Dr. Schiff-Slater's opinions concerning whether Plaintiff was justified in departing work without authorization are beyond his area of expertise and should be excluded**

Under Rule 702, the Court must determine whether a proposed expert is qualified to testify by knowledge, skill, experience, training or education. *See Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 30 (1st Cir. 2000). "That a witness qualifies as an expert with respect to certain matters or areas of knowledge, does not mean that he or she is qualified to express expert opinions as to other fields." *Levin v. Dalva Bros., Inc.*, 459 f.3d 68, 78 (1st Cir. 2006). An expert without expertise in an area should be prevented from testifying on matters in that area. *See Bogosian v. Mercedes-Benz of North Am., Inc.*, 104 F.3d 472, 477 (1st Cir. 1997) (witness does not qualify as an expert where his or her expertise does not lie in a particular area).

Here, it is clear that Dr. Schiff-Slater is not being asked, nor is he being offered, as an expert to opine on the conduct a business owner would expect from its employees. *Schiff-Slater Depo.* at 48:20 – 49:6. Nonetheless, in his report, he states that as a business owner he would not expect one of his staff to make a phone call if he or she was having an incident involving

-9-

"symptoms of shortness of breath and panic." *Schiff-Slater Report* at p. 3.  He also relies on this conclusion to bolster his broader conclusion that "I do not think anyone … would expect" such an employee to pause to make phone calls, and that her departure from work—regardless of how she communicated it to her employer—was "justified." *Id.* at p. 3-4.

Putting aside the fact that Dr. Schiff-Slater did not review any information regarding Woodlands' employee policies or Plaintiff's actual job description, which renders his opinion unreliable for the reasons discussed above, he is not qualified in the first instance to opine on what conduct is reasonable or "justified" with respect to following workplace procedures or protocols.  Again, as a physician, Dr. Schiff-Slater may be qualified to opine *generally* on how a particular condition might affect an employee's ability to work or communicate.  However, his qualifications admittedly do not allow him to testify as an expert regarding the circumstances under which a departure from workplace policies and protocols may be "justified."  And, even if he were qualified to do so, he would not have a reliable basis for offering such testimony in the absence of sufficient information indicating Plaintiff's particular medical condition on June 26, 2014, and in the absence of any information regarding Woodlands' particular policies and protocols and Plaintiff's job responsibilities.

The Court should therefore exclude Dr. Schiff-Slater from offering any opinion as to whether Plaintiff's conduct on June 26, 2014, was "justified" because such testimony is beyond his area of expertise and, even if it were not, it is unreliable.

## CONCLUSION

For the above reasons, the Court should exclude Dr. Schiff-Slater's testimony.

10075557.1

Dated at Portland, Maine this 11th day of February, 2016.


                       */s/ Michael G. Messerschmidt*
                       */s/ Kevin J. Haskins*

                       Michael G. Messerschmidt, Esq.
                       Kevin J. Haskins, Esq.
                       *Attorneys for Woodlands Senior Living of*
                       *Brewer, LLC*
                       Preti Flaherty Beliveau & Pachios LLP
                       One City Center
                       P.O. Box 9546
                       Portland, ME 04112-9546
                       207.791.3000
                       mmesserschmidt@preti.com
                       khaskins@preti.com

10075557.1

## CERTIFICATE OF SERVICE

I, Kevin J. Haskins, attorney for Defendant Woodlands Senior Living of Brewer, LLC, hereby certify that I electronically filed Defendant's *Daubert* Motion *in limine* to Exclude Expert Testimony of Dr. Scott Schiff-Slater with Incorporated Memorandum of Law with the Clerk of Court and that service has been made on all those registered to receive service through the Court's ECF system in this matter.

Dated:          February 11, 2016


                                                    */s/ Kevin J. Haskins*
                                                     Kevin J. Haskins


PRETI FLAHERTY
One City Center
P.O. Box 9546
Portland, Maine  04112-9546
(207) 791-3000
khaskins@preti.com

10075557.1