UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CHRISTY DORR, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:15-cv-00092-GZS |
| | ) | |
| WOODLANDS SENIOR LIVING | ) | |
| OF BREWER, LLC, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY**

In this action, Plaintiff Christy Dorr alleges that Defendant Woodlands Senior Living of
Brewer, LLC discriminated against her based on her gender and disability, engaged in unlawful
retaliatory conduct, failed to accommodate her disability, and denied her medical leave in violation
of state and federal law when it terminated her employment after she left work due to a medical
event.

The matter is before the Court on Defendant's Motion for Summary Judgment (ECF No.
30) and Defendant's Motion in Limine to Exclude Expert Testimony (ECF No. 31).   After
consideration of the parties' arguments, I recommend the Court grant in part and deny in part
Defendant's motions.[1]

I.    **BACKGROUND FACTS**

On June 27, 2014, Defendant notified Plaintiff that her employment as a Certified
Residential Medication Aide ("CRMA") was terminated.  (Def.'s Statement of Material Facts

---

[1] The Court referred the matters pursuant to 28 U.S.C. § 636.  Although it is not apparent that the motion in limine
controls the outcome with respect to any claim addressed in the motion for summary judgment, I issued a
recommended decision on the motion in limine to allow the Court to apply the same de novo standard of review that
will apply to its consideration of the summary judgment motion.

("DSMF") ¶¶ 1 – 2, ECF No. 29; Pl.'s Opposing Statement of Material Facts ("POSMF") ¶ 1, ECF No. 40.)  Prior to the termination of her employment, Plaintiff had a positive work history and was regarded as a good employee, despite some attendance issues.[2]  Plaintiff had previously been employed by Defendant, and Defendant's Executive Director, Benjamin Smith, had provided a very positive assessment of her based on her prior period of employment with Defendant.  (Pl.'s Additional Statement of Material Facts ("PASMF") ¶¶ 1 – 5, ECF No. 40.)

On June 26, 2014, Plaintiff was scheduled to begin work at 6:30 a.m. as the dayshift CRMA.  (DSMF ¶ 7.)  When Plaintiff arrived at work, she went to the medication cart assigned to her that day.[3]  (Id. ¶ 8.)  She performed the medication count with the overnight CRMA, listened to the overnight CRMA's report regarding the overnight shift, and proceeded to put her personal items away in a closet.  (Id. ¶ 9.)  Shortly before 7:00 a.m., while Plaintiff was putting her personal items away, co-worker Courtney Mihalik informed Plaintiff that Plaintiff's boyfriend, Keema Jackson, also a co-worker, was cheating on Plaintiff with another of Defendant's employees.  (Id. ¶ 10.)

Plaintiff was at the time pregnant with Mr. Jackson's child, and was emotionally overcome by the news.  She experienced difficulty breathing, did not have her inhaler with her, felt like she was having a panic attack,[4] and believed that if she did not address her symptoms by immediately

---

[2] Defendant admits that Plaintiff's absences from work prior to June 26, 2014, played no role in the decision to terminate her employment.  (PASMF ¶ 7.)

[3] As a CRMA, Plaintiff's primary duties included administering medications to residents as prescribed and maintaining the security of all controlled drugs entrusted to her, including those contained in the medication cart entrusted to her in the course of her job.  (DSMF ¶ 3.)

[4] Plaintiff has suffered from anxiety and panic attacks for her entire adult life and received medical care for the condition, including treatment on at least twenty-four occasions in the last five years.  At times, Plaintiff has taken medication, which helps control her panic attacks.  After becoming pregnant in the spring of 2014, Plaintiff decided not to take anti-anxiety medication due to concerns about the potential impact of her medications on her unborn baby.  When Plaintiff suffers a panic attack, she experiences the following symptoms: feeling overwhelmed, feeling trapped, feeling that she is going to die, feeling the need to get to a safe place, inability to think about anything except the

going home, she could experience a miscarriage.[5]  (*Id.* ¶ 11; POSMF ¶ 11; PASMF ¶¶ 23 – 26, 28.)  Because of her emotional condition, Plaintiff determined she was unable to care for the residents of the facility, and that she had to leave the facility and get to a safe place.[6]  (PASMF ¶ 27 – 28, 31.)  Plaintiff told her co-worker, Ms. Mihalik, that she needed to leave, gave Ms. Mihalik the keys to the medication cart, and requested that Ms. Mihalik ask Kelly Perry, another CRMA, to pass out the medications.  She then left the workplace.  (DSMF ¶¶ 11 – 13; POSMF ¶¶ 11 – 13; PASMF ¶ 32.)

Whenever custody of a medication cart is transferred from one CRMA to another, Defendant's policies and practices require that the two employees conduct a medication count in which the oncoming CRMA counts the medications and the outgoing CRMA witnesses the count.  (DSMF ¶ 16; PASMF ¶¶ 143 – 144.)  When Plaintiff left work on the morning of June 26, 2014, she failed to perform the medication count with anyone or to find other employees to perform the count.  (DSMF ¶ 17; PASMF ¶ 145; DRSF ¶ 149.)

After exiting the building, Plaintiff went directly to her car and drove herself home.  (DSMF ¶ 18.)  Plaintiff was living with Mr. Jackson at the time, but she did not go home to confront him.  (PASMF ¶ 34.)  Upon arriving home, Plaintiff immediately used her inhaler.  (*Id.* ¶ 35.)

---

overwhelming panic, feeling that her heart is racing, and difficulty breathing.  Plaintiff has learned that if she can get to a private place, such as her home, she can eventually relax and the panic attack subsides.  Plaintiff has also suffered from asthma for most of her life and has received medical care for the condition, including treatment on at least ten occasions in the year and a half prior to the termination of her employment.  When Plaintiff has an asthma attack, she has significant trouble breathing.  Plaintiff has medication that she takes with an inhaler that effectively addresses the symptoms of her asthma.  (PASMF ¶¶ 13 – 22.)

[5] Plaintiff had miscarried before, and had taken leave in the spring of 2014.  (DSMF ¶ 43; PASMF ¶ 6.)  Mr. Smith had heard that Plaintiff needed to call out of some shifts in the spring of 2014 due to a miscarriage.  (PASMF ¶ 6.)  Plaintiff did not experience a miscarriage in connection with the June 2014 incident and delivered her child seven months later.  (DSMF ¶ 56; POSMF ¶ 56; PASMF ¶ 10.)

[6] Plaintiff has designated an expert witness, Dr. Scott Schiff-Slater, who would offer the opinion that Plaintiff's symptoms on the morning of June 26, 2014, were a panic attack and that the symptoms rendered Plaintiff unable to perform her job at that time.  (PASMF ¶¶ 29 – 30.)

Gradually, her breathing returned to normal and her panic subsided. (*Id.* ¶¶ 36 – 39.) Plaintiff was able to control her breathing and calm down, and she did not believe she needed medical care. (DSMF ¶¶ 33 – 34; POSMF ¶¶ 33 – 34.) She waited for approximately forty-five minutes before confronting Mr. Jackson, who was not working at the time. (DSMF ¶ 19.) Plaintiff then discussed the matter with Mr. Jackson for fifteen or twenty minutes, and Mr. Jackson confirmed that he was involved in another relationship. (*Id.* ¶ 20.)

While she was at home, Plaintiff was visited by a co-worker, Samantha Morrone, who gave Plaintiff her phone to use as Plaintiff's own phone was not active at that time. (*Id.* ¶ 22.) After calling her parents and a co-worker, at 9:57 a.m., Plaintiff called Defendant. (*Id.* ¶¶ 23, 24, 29; PASMF ¶ 42.) Plaintiff was unsuccessful in her attempts to contact her supervisor, Chelsea Hodgson, who was not present at the facility.[7] (POSMF ¶¶ 30, 32; PASMF ¶¶ 43 – 44.) Plaintiff did not call any other supervisor or leave a message on voicemail. (DSMF ¶¶ 14 – 15.) Later that day, Plaintiff's supervisors, including Defendant's Executive Director, Benjamin Smith, and Defendant's Program Coordinator, Chelsea Hodgson, attempted to contact Plaintiff to determine her whereabouts, but they were unsuccessful. (DSMF ¶ 35.)

Plaintiff returned to Defendant at approximately 3:00 p.m. on June 26, 2014, and met with Mr. Smith and Ms. Hodgson.[8] (*Id.* ¶ 44; PASMF ¶ 64.) Although she did not have any health concerns at that time (DSMF ¶ 46), Plaintiff explained that she had been told that morning that her boyfriend was cheating on her and that she was angry about it and had become upset. (*Id.* ¶ 47.)

---

[7] Ms. Hodgson, Mr. Smith, and the other members of leadership were attending a breakfast off site when Plaintiff called. (PASMF ¶ 58.) By the time Plaintiff made her call to Defendant, Ms. Hodgson had learned from Ms. Perry that Plaintiff had left the facility, but Ms. Hodgson did not attempt to contact another employee to come in who was not scheduled because she did not feel it was necessary. (*Id.* ¶¶ 51 – 55; DRSF ¶¶ 52, 54 – 55.)

[8] Plaintiff states that at the time, she did not understand that her health conditions (her anxiety, asthma, and pregnancy) might provide her with a justification for leaving work if she was unable to work. (POSMF ¶ 48.)

She stated that she did not want to lose her job.  (*Id.* ¶ 48.)  According to Plaintiff, she told them that she had a panic attack and an asthma attack, that she needed to get out of the facility and get to her home where she felt safe, and that she was pregnant and was concerned about a miscarriage.[9] (PASMF ¶¶ 66 – 67; DRSF ¶¶ 66 – 77.)  Plaintiff maintains that during the meeting, Ms. Hodgson and Mr. Smith told her they would consider the matter and get back to her.[10]  (PASMF ¶ 73.)

Mr. Smith alone made the decision to terminate Plaintiff's employment. (DSMF ¶¶ 38.) Mr. Smith informed Plaintiff that her employment was terminated when Plaintiff appeared at the workplace on June 27, 2014.  (*Id.* ¶ 55; PASMF ¶ 83.)

According to Mr. Smith, he made the decision to terminate Plaintiff's employment based on job abandonment before Plaintiff appeared at the workplace and spoke with him on June 26; when he made the decision, he did not know Plaintiff was pregnant, or that she suffered from panic attacks as the result of anxiety;[11] he would already have written a termination letter before meeting with Plaintiff if he had the opportunity to do so; his decision was consistent with every other incident in which an employee walked off the job without authorization; the meeting with Plaintiff did not cause him to change his mind about terminating Plaintiff's employment; and that he prepared the termination letter later in the day on June 26.  (*Id.* ¶¶ 36, 37 39, 40, 49, 53, 54.)

---

[9] Mr. Smith and Ms. Hodgson have testified that Plaintiff did not inform Mr. Smith and Ms. Hodgson that she was pregnant, or that she had asthma or anxiety-related panic attacks.

[10] Mr. Smith testified that "the meeting … was the first time I had any sort of information so I needed some time to pull things together and so I said I would contact her that afternoon or tomorrow morning to arrange a meeting." (PASMF ¶ 75; *see also id.* ¶¶ 80 – 81 (discussing Mr. Smith's preparation of a termination notice after he "received all the information").)

[11] Plaintiff's work records and work history did not reflect that she had asthma or experienced panic attacks.  (DSMF ¶¶ 41 – 42.)  In his affidavit, Mr. Smith states that Plaintiff "did not mention any concerns about a panic/anxiety attack, a miscarriage, or trouble with breathing."  (Smith Aff. ¶ 21, ECF No. 30–1.)

In the past, there were occasions when one or more of Defendant's employees have been very sick while at work and left work, and someone other than the sick employee notified the on-call supervisor or another employee.  (PASMF ¶¶ 104 – 106.)  While Defendant will consider whether an employee is able to provide advance notice of an absence (*Id.* ¶¶ 109 – 110), Defendant trains its employees to notify the on-call supervisor of their absences when able. (DRS ¶ 109.)[12] Approximately once each month, maybe less, an employee who starts a shift finds that for some medical reason he or she is not able to finish the shift.  (PASMF ¶ 130.)

One employee was late to work on two occasions in January 2012 and on March 3, 2012, called the facility to say she would be late, but never arrived at work.  Subsequently, the employee was tardy on additional occasions.  Defendant suspended the employee and put the employee on probation, without terminating the employment of the employee.  (*Id.* ¶ 158.)   In June 2014 and again in August 2014, Mr. Smith wrote warnings to two different employees for the failure to report to work (no-show/no-call) and for the failure to notify Defendant of their inability to work. The warnings stated that future occurrences would include disciplinary action up to and including termination.  (*Id.* ¶¶ 160, 162.)

More than 100 of Defendant's employees have been terminated, however, for no-call/no-show conduct.  (DRSF ¶¶ 158, 162.)  According to Defendant, of the five known CRMAs who left work without authorization before the end of their shifts, all were terminated.   (*Id.*)

## II.   DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY (ECF NO. 31)

Plaintiff designated Scott Schiff–Slater, MD, to serve as an expert witness.  Dr. Schiff–Slater was not a treating physician, but reviewed Plaintiff's medical records and diagnoses, and

---

[12] Defendant observes that Plaintiff did not tell anyone, not even another employee on her shift, why she was leaving; that she spoke with others before calling work; that she did not seek medical care; and that she did not leave a voicemail or call-back number for the on-call supervisor when she called work later that morning.  (DRS ¶ 110.)

Plaintiff's contentions related to her symptoms on June 26, 2014.  Based on this review, Dr. Schiff–Slater opined that Plaintiff's history of mental health symptoms is fairly characterized as "moderately severe," that Plaintiff has exercised good judgment regarding her treatment and care, that discontinuation of psychiatric medications due to pregnancy is common among patients and "is often the standard of care," and that without medication, "stressors of any kind would be much more difficult to handle" for Plaintiff, especially as "mood disturbances are common in pregnancy."  Dr. Schiff–Slater also characterizes Plaintiff's asthma condition as a diagnosis of Persistent Moderate Asthma that was not well controlled.  According to Dr. Schiff–Slater, the symptoms of an anxiety attack or panic attack can be "difficult to distinguish from an asthma attack."  Addressing Plaintiff's prior miscarriage, Dr. Schiff–Slater observes that that event "would cause anyone pause."  (Aug. 21, 2015 Letter of Dr. Schiff–Slater to Maine Employee Rights Group, ECF No. 31–1.)

As to Plaintiff's claim of disability, Dr. Schiff–Slater offers the following opinions:

(1) that Plaintiff was not able to work safely on June 26, 2014;

(2) that Plaintiff could not reasonably be expected "in the midst of symptoms of shortness of breath and panic to pause to make extra phone calls;"

(3) that he would not expect a member of his own staff to make a call to a supervisor at that time, but would expect a co-worker to send the employee home and then follow-up with a supervisor to "work out the details;"

(4) that Plaintiff's symptoms "without question … were very real, and would have precluded her ability to work, both for her own health … and for the safety of the patients she cared for;"

(5) that asthma is associated with poorer pregnancy outcomes and that it "is normal and expected for a pregnant woman who is short of breath, and anxious and uncomfortable, to be appropriately concerned about the safety of her fetus;" and

(6) that "her leaving work on June 26, 2014, was justified," "showed good judgment," and "was the safe and appropriate action for her to take." (*Id.*)

Defendant argues that the opinions are unreliable and/or exceed the scope of Dr. Schiff–Slater's expertise.

## A.      The Rule 702 Standard

The Federal Rules of Evidence provide that a person with expert or specialized "knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the testimony would prove helpful to the finder of fact and is supported by sufficient indicia of reliability.   Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  In general, reliability is determined based on the presence of sufficient facts or data, reliable principles and methods, and proper application of the principles and methods to the facts or data at issue in the case.  Fed. R. Evid. 702(b), (c), (d).  The Rules of Evidence thus impose a "gatekeeping role for the judge," who must evaluate proposed expert testimony in light of its ability to assist with the "particularized resolution of legal disputes."  *Daubert*, 509 U.S. at 597.

Although the applicable rules do not impose any particular procedure that must be followed when evaluating expert testimony, "the gatekeeper function must be performed."  *Smith v. Jenkins*, 732 F.3d 51, 64 (1st Cir. 2013).  When performing the gatekeeping function, courts should require that the proponent of the expert testimony demonstrate "that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion," but courts should not require proof that the expert's conclusion is in fact correct.  *Ruiz–Troche v. Pepsi Cola of P.R.*

8

*Bottling Co.,* 161 F.3d 77, 85 (1st Cir. 1998).  "[W]hen the adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion." *Carmichael v. Verso Paper, LLC,* 679 F. Supp. 2d 109, 119 (D. Me. 2010). "If the factual underpinnings of [the expert's] opinions [are] in fact weak, that [is] a matter affecting the weight and credibility of their testimony." *Payton v. Abbott Labs,* 780 F.2d 147, 156 (1st Cir.1985).  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Brown v. Wal–Mart Stores, Inc.*, 402 F. Supp. 2d 303, 308 (D. Me. 2005) (quoting *Larson v. Kempker,* 414 F.3d 936, 941 (8th Cir. 2005)).  However, if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, the opinion must be excluded on foundational grounds. *Zuckerman v. Coastal Camps, Inc.*, 716 F. Supp. 2d 23, 28 (D. Me. 2010).

### B.    Reliability

Defendant argues that Dr. Schiff–Slater's opinions regarding Plaintiff's medical condition on June 26, 2014, and the relationship between her condition and her departure from work are unreliable because (1) without treating Plaintiff at the time, Dr. Schiff–Slater cannot evaluate Plaintiff's diagnoses, including whether a particular condition was exacerbated by any particular events at the time, (2) Dr. Schiff–Slater has never before offered an expert opinion on an individual's ability to work on a particular day, and (3) Dr. Schiff-Slater did not interview Plaintiff and thus cannot opine based on his assumption that Plaintiff's reports of her symptoms are accurate.  (Motion to Exclude at 5 – 8.)  According to Defendant, Dr. Schiff–Slater's opinions are also undermined by the fact that Plaintiff never sought medical care on June 26, 2014.  (*Id.*)

Defendant's concerns can be fairly characterized as issues regarding the weight of rather than the admissibility of the opinions.  Medical experts often conduct forensic evaluations of medical records, and offer opinions based on the records and assumed facts.  While a party can legitimately question the methodology employed by and the accuracy of the facts assumed by the expert, unless the methodology is not recognized in the field, the party's challenges are for the factfinder to assess.  In this case, Defendant has cited no persuasive evidence to suggest that Plaintiff's condition is not susceptible to a forensic evaluation, or that Dr. Schiff-Slater's methodology is not recognized in the field.

### C.    Scope of Expertise

Defendant also requests exclusion of Dr. Schiff–Slater's opinions concerning the reasonableness of Defendant's conduct or expectations.  (Motion to Exclude at 9 – 10.)  The record contains no evidence that Dr. Schiff-Slater is qualified to offer expert opinions regarding the appropriateness of an employer's standards or its labor-related decisions.  Accordingly, to the extent Plaintiff has offered or intends to offer Dr. Schiff-Slater as an expert witness on the reasonableness of Defendant's conduct, Plaintiff has not demonstrated that Dr. Schiff-Slater's opinion is founded on any particular expertise or that his opinion would be of assistance to the finder of fact.

### III.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff asserts twelve counts in her complaint:  (1) sex and disability discrimination in violation of the Maine Human Rights Act (MHRA); (2) failure to accommodate a disability in violation of the MHRA; (3) unlawful retaliation in violation of the MHRA; (4) disability discrimination in violation of the Americans with Disabilities Act (ADA); (5) failure to accommodate in violation of the ADA; (6) unlawful retaliation in violation of the ADA; (7)

disability discrimination in violation of the Rehabilitation Act; (8) failure to accommodate in violation of the Rehabilitation Act; (9) retaliation in violation of the Rehabilitation Act; (10) sex (pregnancy) discrimination in violation of Title VII; (11) violation of the federal Family Medical Leave Act; and (12) violation of Maine Family Medical Leave Requirements.

Defendant argues that it is entitled to summary judgment on all claims, primarily because when Mr. Smith made the decision to terminate Plaintiff's employment, Mr. Smith did not know that Plaintiff had a disability, that she was pregnant, or that she experienced a serious medical condition.

### A.      Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011).  If the court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of her claims, a trial-worthy controversy exists and summary judgment must be denied to the extent there are supported claims.  Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

### B.     Analysis

The gravamen of Defendant's request for summary judgment is that (1) when an employee who is entrusted with a medication cart leaves work without notice to her employer, termination of her employment is warranted regardless of the employee's circumstances, and (2) the record conclusively establishes that Defendant's decision to terminate Plaintiff's employment was lawful because the decision-maker, Mr. Smith, was unaware of Plaintiff's alleged medical conditions when he made the termination decision.

As to the specific claims, Defendant argues that Plaintiff's failure to accommodate claims fail because Plaintiff never requested an accommodation.  More specifically, Defendant contends that Plaintiff's after-the-fact request for forgiveness or leniency does not constitute a request for an accommodation because it was neither reasonable nor timely.  (Motion at 11 – 13.)

Defendant also contends Plaintiff cannot prevail on her intentional discrimination claims "for the very simple reason that, at the time Defendant made the decision to terminate Plaintiff's employment for job abandonment, Defendant had no knowledge of Plaintiff's alleged medical conditions."  (Motion for Summary Judgment at 7 (discussing all of the discrimination claims collectively); *see also id.* at 8 (disability discrimination claim), 12 (failure to accommodate as discrimination), 14 (retaliation based on a request for accommodation), 16 (sex/pregnancy discrimination).  Alternatively, Defendant argues that the record lacks any evidence that would support a factfinder's conclusion that the termination of Plaintiff's employment was motivated by animus based on a protected status.  (*Id.* at 7, 10 – 11, 13, 15, 17.)

According to Defendant, Plaintiff cannot succeed on her medical leave claims because she did not provide Defendant with notice in advance or "as soon as practicable." (*Id.* at 18.) Finally, Defendant argues that the record does not support a retaliation claim because Plaintiff's request for understanding or leniency after she returned to her place of employment was not protected conduct. (*Id.* at 14 – 15, 20.)

### 1.    *Failure to accommodate*

Plaintiff's failure to accommodate claims arise under the MHRA, the ADA, and the Rehabilitation Act. The standards are the same under all three statutory schemes. *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) ("[T]he case law construing the ADA generally pertains equally to claims under the Rehabilitation Act."); *Pouliot v. Town of Fairfield*, 184 F. Supp. 2d 38, 51 (D. Me. 2002) (construing MHRA failure to accommodate claim as analogous to ADA claim). As recently summarized by the First Circuit:

> An employer must make "reasonable accommodations to the known physical ... limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Reasonable accommodations are modifications or adjustments to the work environment, or to the manner in which the position's duties are customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position. *See* 29 C.F.R. § 1630.2(*o*). An employer is obligated to provide a reasonable accommodation (as long as it is not unduly burdensome) where a protected employee has requested an accommodation or the employer otherwise knew that one was needed. *See Jones v. Nationwide Life Ins. Co.,* 696 F.3d 78, 89 (1st Cir. 2012). The employee's request for an accommodation, however, "must be sufficiently direct and specific, and it must explain how the accommodation is linked to the [employee's] disability" in order to trigger the employer's responsibility to accommodate. *Id.; see Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination,* 441 Mass. 632, 808 N.E.2d 257, 267–68, 270–71 (Mass. 2004).

*Murray v. Warren Pumps, LLC*, --- F.3d ---, No. 13-2133, 2016 WL 1622833, at *3 (1st Cir. Apr. 25, 2016).

To overcome Defendant's motion on the failure to accommodate claims, Plaintiff must point to evidence that would support the following findings:  (1) that she suffered from a disability within the meaning of the statutes; (2) that she was a qualified individual able to perform the essential functions of her job, either with or without a reasonable accommodation; and (3) that despite her employer's knowledge of her disability, the employer did not offer a reasonable accommodation for the disability.  *Calero–Cerezo*, 355 F.3d at 20.

Through its motion for summary judgment, Defendant challenges only the third element of the failure to accommodate claim.  Specifically, Defendant argues that a factfinder could not conclude that Defendant failed to offer a reasonable accommodation because (1) Mr. Smith "was under no obligation to withhold discipline for Plaintiff's admitted misconduct and grant an alleged accommodation request that, even if made, was untimely;" (2) Plaintiff did not seek any medical assistance and her decision to leave was "at her discretion and involved an admitted failure to follow Defendant's absence notification procedures;" and (3) the alleged request "was not to lose her job" and therefore was "not sufficient to put Defendant on notice that she required a special accommodation."  (Motion for Summary Judgment at 12 – 13.) [13]

"To show that a proposed accommodation was reasonable, a plaintiff must prove 'not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances.'" *Calero-Cerezo*, 355 F.3d at 23 (quoting *Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 259 (1st Cir. 2001)).  To request an accommodation for a disability, an employee must give the employer notice of the need for a special accommodation using sufficiently direct and specific language.  *Id.*  "In

---

[13] Plaintiff's failure to accommodate claims do not require a showing of discriminatory bias.  *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999).

some cases, a request for a reasonable accommodation may trigger a responsibility on the part of the employer to enter into an interactive process with the employee to determine an appropriate accommodation." *Id.*

Plaintiff argues that her request for continued employment or retroactive leave was sufficient notice of her need for a reasonable accommodation. She also contends that emergency leave is recognized as an appropriate accommodation in Defendant's workplace. (Plaintiff's Opposition at 11 – 12, ECF No. 41.) Plaintiff further asserts that because leave is a recognized accommodation for medical need, a factfinder reasonably could conclude that Plaintiff was entitled to an accommodation "allowing [her] to leave work immediately … and not terminating her for doing so." (*Id.* at 14.)

A leave of absence can be considered a reasonable accommodation based on an individualized assessment of the facts. *Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647 (1st Cir. 2000). The question, however, is whether a request for understanding or leniency for an unauthorized absence from work constitutes a request for a special accommodation.

Defendant asserts that the United States Equal Employment Opportunity Commission (EEOC) has interpreted federal law to withhold reasonable accommodation protection when an employee engages in disability-related misconduct in advance of a request for accommodation. (Motion at 10, 12, citing EEOC Guidance § III(A)(5).) The EEOC Guidance document entitled, "The Americans With Disabilities Act: Applying Performance And Conduct Standards To Employees With Disabilities," is published on the EEOC's webpage.[14] The guidance is offered to assist employers with managing employee performance issues in the context of disability accommodation. The portion upon which Defendant relies reads as follows:

---

[14] *See* https://www.eeoc.gov/facts/performance-conduct.html#perf (last viewed June __, 2016).

5. Must an employee with a disability ask for a reasonable accommodation at a certain time?

No.  The ADA does not compel employees to ask for accommodations at a certain time.  Employees may ask for reasonable accommodation before or after being told of performance problems.  Sometimes, an employee may not know or be willing to acknowledge that there is a problem requiring accommodation until the employer points out deficiencies in performance.

- *Practical Guidance: Ideally, employees will request reasonable accommodation before performance problems arise, or at least before they become too serious.  Although the ADA does not require employees to ask for an accommodation at a specific time, the timing of a request for reasonable accommodation is important because an employer does not have to rescind discipline (including a termination) or an evaluation warranted by poor performance.*

….

Example 9: An employee with a small advertising firm has a learning disability.  Because the employee had a bad experience at a prior job when he requested accommodation, he decides not to disclose his disability or ask for any accommodations during the application process or once he begins working.  Performance problems soon arise, and the employee's supervisor brings them to the employee's attention.  He tries to solve the problems on his own, but cannot.  The firm follows its policy on counseling and disciplining employees who are failing to meet minimum requirements, but these efforts are unsuccessful.  When the supervisor meets with the employee to terminate his employment, the employee asks for a reasonable accommodation.

The employer may refuse the request for reasonable accommodation and proceed with the termination because an employer is not required to excuse performance problems that occurred prior to the accommodation request. Once an employer makes an employee aware of performance problems, the employee must request any accommodations needed to rectify them. This employee waited too long to request reasonable accommodation.

EEOC Guidance § III(A)(5) (footnotes omitted).

The EEOC publication and several federal court decisions[15] reflect that an employer's

obligation to accommodate a disability is designed to apply prospectively rather than retroactively

---

[15] *E.g., Green v. Medco Health Sols. of Texas, LLC*, 947 F. Supp. 2d 712, 729 (N.D. Tex. 2013), *aff'd sub nom. Green v. Medco Health Sols. of Texas, L.L.C.*, 560 Fed. App'x 398 (5th Cir. 2014); *Brookins v. Indianapolis Power & Light Co.*, 90 F. Supp. 2d 993, 1006 – 1007 (S.D. Ind. 2000); *Schaffhauser v. United Parcel Serv., Inc.*, No. 4:12-cv-00599,

in the form of leniency or forgiveness of prior performance issues.  This principle was followed in *Davila v. Qwest Corp., Inc.*, 113 Fed. App'x 849 (10th Cir. 2004), where the Tenth Circuit reviewed a summary judgment decision in favor of the defendant employer on a failure to accommodate claim.  The plaintiff argued that the defendant failed to provide an accommodation for a mental health condition, specifically, in connection with behavior allegedly resulting from improper medication for bipolar disorder.  *Id.* at 851.  The plaintiff had failed to report an automobile accident he caused while driving a company vehicle.  *Id.*  The facts also suggested that the plaintiff first obtained his bipolar diagnosis as the result of a prior workplace incident in which he engaged in threatening conduct.  *Id.* at 854.  The Court explained that the plaintiff's circumstances did not fit within the reasonable accommodation concept:

> In essence, plaintiff's position is that when defendant learned his workplace violence was evidently rooted in a bipolar condition, defendant was required to retroactively excuse any misconduct related to that condition.  But, as many cases have recognized in various contexts, excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA.  ….
>
> In sum, neither the immediate ground for plaintiff's termination, nor the antecedent disciplinary violation placing him in an employment status vulnerable to termination, implicate ADA protections.  We conclude that plaintiff's ADA claim must fail as a matter of law.

*Id.* (citations omitted) (collecting cases).

Here, as with the plaintiff in the *Davila* case, Plaintiff maintains she is entitled to an accommodation to excuse past behavior that ordinarily would justify discipline in the workplace.

---

2014 WL 197684, at *10 (E.D. Ark. Jan. 15, 2014), *aff'd*, 794 F.3d 899 (8th Cir. 2015); *Parsons v. Auto Club Grp.*, No. 2:12-cv-10907, 2013 WL 4546931, at *5 (E.D. Mich. Aug. 28, 2013), *aff'd*, 565 Fed. App'x 446 (6th Cir. 2014); *but see Sutherland v. Shinseki*, No. 0:11-cv-03118, 2013 WL 5944251, at *10 n.7 (D. Minn. Nov. 6, 2013) ("Although the issue is a close one, the Court decides it in Sutherland's favor on summary judgment in light of the evidence that the VA had not yet decided to terminate her employment on September 16 and because of the factual disputes over the extent to which Sutherland had notified management about her epilepsy before completion of the VA's decision-making process.").

In support of her claim, Plaintiff does not propose a prospective accommodation other than, perhaps, to be exempt from rules governing behavior in the workplace if she can show that her behavior was the product of her alleged disability. Plaintiff also does not suggest that she would have required special accommodation to perform the work to which she was assigned or that Defendant's workplace imposed any obstacle that would warrant a special accommodation.

Plaintiff's claim is much like the claim asserted by the plaintiff in *Hill v. Kansas City Area Transportation Authority*, 181 F.3d 891 (8th Cir. 1999). In *Hill*, the Eighth Circuit affirmed the entry of summary judgment in favor of the defendant on the plaintiff's failure to accommodate claim where the requested accommodation involved at least in part a request for leniency or forgiveness of a behavioral issue. The plaintiff asserted that she twice fell asleep on the job due to the effects of medication taken for hypertension and pain relief. *Id.* at 892. She did not inform her employer of her condition until her disciplinary meeting with her supervisor. *Id.* at 893. The employer terminated her employment a week later. *Id.* When discussing the plaintiff's failure to accommodate claim, the court characterized the claim as "fatally flawed." *Id.* at 894. A major fault with the claim, according to the court, was plaintiff's failure to inform her employer of her condition until after she had committed the work rule violation. *Id.* The court concluded that the plaintiff's request "for a second chance to better control her treatable medical condition" was "not a cause of action under the ADA." *Id.*

The First Circuit has also recognized that, "[w]hen an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late.'" *Jones v. Nationwide Life Ins. Co.*, 696 F.3d

78, 90 (1st Cir. 2012)[16] (quoting *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 262 n.9 (1st Cir. 2001),[17] and citing, inter alia, *Hill*, 181 F.3d at 894, *Rose v. Laskey,* 110 Fed. App'x. 136, 138 (1st Cir. 2004) (per curiam),[18] and *Soileau v. Guilford of Me., Inc.,* 105 F.3d 12, 17 n. 4 (1st Cir. 1997).)[19]

      As a general rule, to require a plaintiff to request the accommodation before disciplinary action is imposed or is imminent is logical.  Otherwise, whenever an employer terminates an employee, the employer would be subject to a failure to accommodate claim if, during a

---

[16] In *Jones*, the Court affirmed the entry of summary judgment in favor of the defendant on the plaintiff's claim of failure to accommodate primarily based on the plaintiff's failure to notify adequately his employer of not only the need for an accommodation, but also the relationship between the requested accommodation and the alleged disability. 696 F.3d at 89 – 90.  The Court reinforced its holding with the observation that the plaintiff made his request "too late" because he made it "after [he] knew his employment was being terminated after his failure to perform an essential function of his job." *Id.* at 90.  Specifically, the plaintiff failed to pass a required licensing exam due to side effects resulting from morphine and oxycodone prescriptions for pain. *Id.* at 82.

[17] In *Reed*, the First Circuit affirmed the entry of summary judgment against the plaintiff on a failure to accommodate claim where the plaintiff claimed "her conduct should be forgiven because she is mentally ill." 244 F.3d at 255.  The Court primarily concluded that the plaintiff "neither adequately requested nor was prevented from exercising the accommodation" she claimed, which accommodation request was to walk away from stressful conflicts with supervisors. *Id.* at 255, 260.  The Court did not necessarily reject the reasonableness of the proposed accommodation, but rather held that the plaintiff failed to adduce evidence that she made her employer "sufficiently aware that she had a disability marked by occasional fits of rage and consequently needed some sort of *special* accommodation." *Id.* at 260.  The Court observed that the plaintiff only arguably communicated her desired accommodation after she engaged in a "belligerent, vituperative attack" on a supervisor, *id.* at 262, which the Court characterized in a footnote as "too little, too late," *id.* n.9.

[18] In *Rose*, the Court affirmed the entry of summary judgment against the plaintiff on a failure to accommodate claim where the plaintiff relied on "a therapist's letter, delivered to defendant after the incident in question (and introduced for the first time on appeal), asserting that he would benefit from a leave of absence of unspecified length." 110 Fed. App'x at 138.  The Court explained that while it had held that a leave of absence could be a reasonable accommodation for an employee suffering from depression, the plaintiff's case was different because it involved "threatening behavior" and because the plaintiff's request to be subjected to "regular security screening" was both untimely and unreasonable. *Id.*

[19] In *Soileau*, the First Circuit affirmed the entry of summary judgment on an accommodation-related retaliation claim, where the plaintiff requested that the employer consider recent performance issues to be the result of a bout of depression, but the employer terminated his employment after he failed to submit a performance improvement plan. 105 F.3d at 14.  The Court did not discuss separately whether the employer's decision to terminate the plaintiff's employment could be construed to support a failure to accommodate claim, possibly because there was evidence that the employer had granted some accommodation by relieving the employee of the duty to conduct meetings. *Id.* at 17.  In any event, the Court exclusively considered the case as requiring a showing of retaliatory motive, as that was the only claim before the Court on appeal.  However, even in that context, the Court noted its concern that "the line of argument presented by [the plaintiff] would permit an employee already on notice of performance problems to seek shelter in a belated claim of disability." *Id.* n.4.

disciplinary meeting, the employee requests a "second chance" based on a condition that might qualify as a disability.  As other courts have recognized, the right to reasonable accommodation was not designed to protect an employee against disciplinary action for past conduct.  In this case, when Plaintiff met with Mr. Smith later in the day on June 26, Plaintiff understood her job was in jeopardy, and raised her medical issues as an explanation for her conduct.  Significantly, the record lacks any evidence that Plaintiff notified Defendant before June 26 of her alleged disability, or that she had previously requested an accommodation for the need to take unexpected leave as the result of the disability. If Plaintiff had so notified Defendant and requested an appropriate accommodation before the events of June 26, Plaintiff would likely have an actionable claim for failure to accommodate.  Because Plaintiff did not notify Defendant of her medical condition and request an accommodation before June 26, Plaintiff's plea for leniency when faced with the prospect of discipline, including termination, is "too little, too late."  *Jones*, 696 F.3d at 90.

### 2.      *Accommodation retaliation*

"The ADA prohibits discrimination against an individual 'because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'"  *Soileau*, 105 F.3d at 16 (quoting 42 U.S.C. § 12203(a)).  The Maine Human Rights Act contains the very same prohibition.  5 M.R.S. § 4633(1).  The Rehabilitation Act, though lacking this exact language, is interpreted consistently.[20]  29 U.S.C. § 794(d).  Under all of the statutes, proof of a claim of retaliation requires a showing that the plaintiff engaged in protected activity.  *Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 115 (1st Cir. 2013) (ADA); *Doyle v.*

---

[20] In her complaint, Plaintiff cites 42 U.S.C. §§ 12101 et seq. in reference to the Rehabilitation Act.  The proper citation is 29 U.S.C. §§ 791 et seq.  Presumably the Rehabilitation Act applies in this case because Defendant qualifies as a "program or activity" that receives federal financial assistance in order to provide health care services.  *Id.* § 794(b)(3)(A).

*Dep't Of Human Servs.*, 2003 ME 61, ¶ 20, 824 A.2d 48, 55 – 56 (MHRA); 29 U.S.C. § 794(d) (Rehabilitation Act).

Although "[r]equesting an accommodation is protected conduct," *Freadman v. Metro. Prop. And Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007), as explained above, Plaintiff did not request an accommodation, nor did she oppose any act or practice made unlawful by federal or state law, or make a charge, testify, assist, or participate in any manner in an investigation, proceeding, or hearing under the ADA, Rehabilitation Act, or MHRA, prior to the termination of her employment.

### 3.    *Intentional discrimination*

The prima facie elements of a disability discrimination claim require a showing (1) that Plaintiff was disabled as defined by the ADA or MHRA; (2) that Plaintiff was qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) that she suffered an adverse employment action in whole or in part because of her disability. *Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 458 (1st Cir. 2016); *Doyle v. Dep't Of Human Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48, 54.[21]

For summary judgment purposes, the record establishes that Plaintiff is a qualified individual with a disability, who was subjected to an adverse employment action because of behavior that was an unavoidable consequence of her disability and pregnancy.  The issue is whether the record would support a finding that Defendant's decision to terminate Plaintiff's employment was the product of unlawful discrimination.  More specifically, the issue is whether

---

[21] The First Circuit has cautioned courts in this circuit that they not assume the role of super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory decisions.  *E.g., Perez v. Horizon Lines, Inc.*, 804 F.3d 1, 10 (1st Cir. 2015).  Thus, Plaintiff must do more than show that the discipline she received was "wrong or tactless," or overly harsh.  *Collazo–Rosado v. Univ. of Puerto Rico*, 765 F.3d 86, 92 (1st Cir. 2014).

a genuine factual issue exists regarding Defendant's non-discriminatory explanation for firing Plaintiff. *Pagan–Colon v. Walgreens of San Patricio, Inc.*, 697 F.3d 1, 9 (1st Cir. 2012). Defendant argues that a reasonable factfinder could not determine that the termination decision was motivated by discriminatory animus because Mr. Smith made his decision before he met with Plaintiff and, therefore, before he allegedly learned of her disability and pregnancy. Defendant's argument is unconvincing.

Some evidence of the employer's knowledge of the employee's protected status is ordinarily, if not universally, required to support an intentional discrimination claim. *See, e.g., Joyce v. Postmaster Gen., U.S. Postal Serv.*, 846 F. Supp. 2d 268, 288 – 89 (D. Me. 2012); *Clapp v. N. Cumberland Mem'l Hosp.*, 964 F. Supp. 503, 507 (D. Me. 1997). According to Plaintiff, during her June 24 meeting with Mr. Smith, she informed Mr. Smith of all of her conditions and explained that her symptoms, and fear of miscarriage, were generated by the stress of learning that her boyfriend was cheating on her. The question is thus whether the record could support a finding that Mr. Smith made the decision to terminate Plaintiff's employment after he met with Plaintiff.

Although Mr. Smith maintains he made the decision before he met with Plaintiff, the record includes facts that could reasonably support an alternative conclusion. Indeed, the mere fact that Mr. Smith did not terminate Plaintiff's employment during the meeting could reasonably suggest Mr. Smith did not make his decision until sometime after the meeting and thus after he learned of Plaintiff's medical conditions.

Defendant also contends that summary judgment is appropriate because due to the significance of Plaintiff's misconduct (walking off the job without providing a supervisor with notice in advance or as soon as practicable), Defendant would have terminated Plaintiff's employment regardless of any protected status she might have had. Defendant further argues that

the record lacks any evidence from which a factfinder could reasonably infer that Defendant's legitimate, non-discriminatory justification is a mere pretext offered to disguise a discriminatory motive.  (Motion for Summary Judgment at 7, 10 – 11, 15, 17.)

A plaintiff may overcome a summary judgment motion by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and [with or without additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  A plaintiff may also point to the "close temporal proximity between two events" and any apparent departure from the ordinary procedures related to a disciplinary investigation.  *Id.* at 169.  Where genuine issues exist regarding such factors, a plaintiff's presentation may also be bolstered by "'doubts about the fairness' of an employer's decision." *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Plaintiff argues in part that a pretext showing is not required in this case because the record contains direct evidence of discriminatory animus.  (Opposition at 4.)  In Plaintiff's words:

> [T]he Defendant in this case has asserted that its termination decision was based on [Plaintiff's] need to leave her shift on June 26th where the need to leave her shift and use of emergency leave for that shift was the requested accommodation.  This is direct evidence of intentional disability discrimination on the part of the Defendant.

(*Id.* at 4 – 5.)  In support of this argument, Plaintiff cites *Criado v. I.B.M.*, 145 F.3d 437 (1st Cir. 1998).

In *Criado*, the First Circuit reviewed a jury verdict in favor of the plaintiff in the context of the defendant's appeal from the trial court's denial of a post-trial motion for judgment as a

matter of law.  *Id.* at 441.  The trial record reflected that the plaintiff requested, and the defendant authorized, a period of leave for the plaintiff to receive care for a mental health disability that situational stressors temporarily rendered incapacitating.  When the plaintiff's physician requested a further period of leave for the plaintiff from the defendant's medical department, the request went unanswered and the plaintiff's local supervisor terminated the plaintiff's employment based on the plaintiff's failure to report to work.  *Id.* at 440.  The defendant argued that the termination was not discriminatory because the request for additional leave was not answered due to a miscommunication.  *Id.* at 444.  The Court found this argument unpersuasive, and explained that "[i]f the termination was the result of a communication mistake [the plaintiff] should have been reinstated once her physician explained her condition and prognosis and asked for additional leave."  *Id.*  Additionally, the Court reasoned that because the plaintiff's absence from work was both the cause for her termination and the cause for her request to further extend her approved leave, the jury could reasonably have concluded that the defendant terminated the plaintiff because of her need for additional leave.  *Id.* at 444 – 45.  Based on *Criado*, Plaintiff argues that Defendant's reliance on her unannounced departure from work to justify its termination decision could fairly be regarded by the jury as direct evidence that Defendant terminated her because of a temporary work incapacity that arose from an underlying mental health disability.  (Opposition at 4 – 5.)

Plaintiff also asserts she can overcome Defendant's motion because the factfinder could consider the stated justification for her termination as a pretext based on: (1) the close temporal relationship between her report of a disability and pregnancy and the decision to terminate; (2) Defendant's attempt to assert that Mr. Smith's decision was made before his meeting with Plaintiff, which assertion the factfinder could reject; (3) the relative insignificance of the alleged requirement to provide a shift supervisor with advance notice, where the record supports a finding

that advance notice is not always demanded; (4) Ms. Hollobaugh's[22] testimony that nobody ever asked her whether Plaintiff had provided notice prior to her departure; (5) Defendant's more lenient treatment of employees who are no-show/no-call; (6) Mr. Smith's failure to consult with Ms. Sirois about issues related to medical leave, reasonable accommodation, and anti-discrimination, contrary to usual practices; and (7) Ms. Hodgson's failure to inquire whether Plaintiff had completed her medication count before Plaintiff left the facility.  (*Id.* at 5 – 9.)

In this case, the record evidence, when viewed most favorably to Plaintiff, includes a close temporal relationship between the termination of Plaintiff's employment and Plaintiff's disclosure of her medical conditions, and the fact that Defendant did not terminate other employees who, without advance notice, were late for work or did not report to work.  Such evidence is sufficient to generate a material issue as to whether Defendant terminated Plaintiff's employment due to Plaintiff's disability.

### 4.      *Family medical leave*

Both the federal Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2611 – 2619, and the Maine Family Medical Requirements (FMLR), 26 M.R.S. §§ 843 – 848, guarantee to eligible employees the right to take medical leave under certain circumstances and prohibit employers from denying or interfering with the exercise of the right to take leave, and from discriminating on the basis of certain conduct related to leave taking.  29 U.S.C. §§ 2612, 2615; 26 M.R.S. §§ 844, 847.  The acts authorize private civil actions for damages based on violations.  29 U.S.C. § 2617; 26 M.R.S. § 848.

Because the FMLA and the FMLR both provide a right to leave without interference, and prohibit retaliation for acts taken in relation to leave, a plaintiff can bring two types of claims, one

---

[22] Ms. Hollobaugh was the team leader on the morning in question.  (PASMF ¶ 45.)

based on the denial of "substantive entitlements" concerning leave (e.g., denial of leave) and one based on the employer's use of leave activity as a "negative factor" in employment decisions (e.g., retaliation for leave activity, often referred to as "FMLA retaliation" or "FMLR retaliation"). *Mellen v. Trustees of Boston Univ.*, 504 F.3d 21, 26 − 27 (1st Cir. 2007); *Pagan–Colon*, 697 F.3d at 8 − 9. A claim based on the denial of substantive entitlements does not require a showing that the employer harbored a culpable state of mind. *Mellen*, 504 F.3d at 26. A negative factor claim requires a showing that the leave activity motivated the employer's adverse employment action. *Pagan–Colon*, 697 F.3d at 8 ("[A] crucial component of an FMLA retaliation claim is some animus or retaliatory motive on the part of the plaintiff's employer that is connected to protected conduct.").

### a.      *Defendant's arguments*

Defendant does not dispute that Plaintiff was eligible for leave under federal or Maine law based on her length of employment. Defendant, however, argues that Plaintiff's alleged health condition did not qualify as serious because Plaintiff did not seek medical assistance. (Motion at 18 n.2.) In addition, quoting a Department of Labor regulation, Defendant argues that summary judgment is warranted because Plaintiff did not provide Defendant with notice "as soon as practicable under the facts and circumstances of the particular case." (Motion at 18, quoting 29 C.F.R. § 825.303(a) ("Employee notice requirements for unforeseeable FMLA leave").) Defendant notes that the regulation states that it "generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable to such leave." (*Id.*, quoting 29 C.F.R. § 825.303(a)). As to Plaintiff's retaliation or negative factor claim, Defendant argues that Plaintiff

cannot generate an issue for trial because Mr. Smith made his decision to terminate Plaintiff before he was aware of any information concerning the reasons for Plaintiff's leave.  (Motion at 20.)

### b.   Substantive entitlement claim.

The summary judgment record raises a genuine issue of fact whether Plaintiff experienced a need for leave based on a serious health condition. 29 U.S.C. § 2612(a)(1)(D), 26 M.R.S. § 843(4)(A).  The record also includes a genuine issue regarding Defendant's usual and customary notice requirements.  In other words, viewing the record in the light most favorable to Plaintiff, a factfinder could conclude that the timing of Plaintiff's notice was "practicable" as contemplated by the Department of Labor regulations, 29 C.F.R. § 825.303(a).  Defendant's "substantive entitlement" argument thus fails.

### c.   Negative factor claim

To state a prima facie case of retaliation, a plaintiff must show (1) that she availed herself of a protected right under the FMLA, (2) that she was adversely affected by an employment decision, and 3) that there was a causal connection between the protected conduct and the adverse employment action.  *Pagan – Colon*, 697 F.3d at 9.  Causation may be established through direct evidence or circumstantial evidence of improper motive.  *Id.*

Defendant argues that Plaintiff cannot satisfy the causation element because Mr. Smith made the termination decision before receiving any notice.  As explained above, a genuine factual issue exists as to when Mr. Smith made the decision to terminate Plaintiff's employment.  Accordingly, Defendant is not entitled to summary judgment on Plaintiff's FMLA and FMLR negative factor / retaliation claims.

CONCLUSION

Based on the foregoing analysis, I recommend the Court grant in part and deny in part Defendant's Motion in Limine to Exclude Expert Testimony (ECF No. 31), and grant in part and deny in part Defendant's Motion for Summary Judgment (ECF No. 30).  In particular, I recommend the Court exclude Dr. Schiff-Slater's proffered opinion testimony regarding the expectations of an employer, and the reasonableness of Defendant's management of Plaintiff's situation.  I also recommend the Court enter summary judgment on Plaintiff's accommodation-related claims under the ADA, Rehabilitation Act, and MHRA (counts II, III, V, VI, VIII, IX).  Otherwise, I recommend the Court deny the motions.

**NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 27th day of June, 2016.